1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,                    )
                                             )    15-CR-00252 (PKC)
                    Plaintiff,               )
                                             )
V.                                           )    United States Courthouse
                                             )    Brooklyn, New York
                                             )
JOSE MARIA MARIN AND                         )    TUESDAY, FEBRUARY 14, 2017
JUAN ANGEL NAPOUT,                           )     3:30 p.m.
                    Defendants.              )
_____             )


              TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
                BEFORE THE HONORABLE PAMELA K. CHEN
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:
FOR THE PLAINTIFF:         ROBERT L. CAPERS
                           United States Attorney's Office
                           Eastern District of New York
                           BY:  SAM NITZE
                                KRISTIN MACE
                                PAUL TUCHMANN
                                KEITH EDELMAN
                           Assistant United States Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York 11201


FOR DEFENDANT MARIN:       STILLMAN & FRIEDMAN, P.C.
                           BY:  CHARLES ALLEN STILLMAN, ESQ.
                                JAMES ALFRED MITCHELL, ESQ.
                                JULIO BARBOSA, ESQ.
                                JIM MITCHELL, ESQ.
                           425 Park Avenue
                           New York, New York 10022


FOR DEFENDANT NAPOUT:      GREENBERG TRAURIG, LLP
                           BY:  A. JOHN PAPPALARDO, ESQ.
                           One International Place
                           Boston, Massachusetts 02110

2

1   APPEARANCES:(CONTINUED)

2

    FOR DEFENDANT NAPOUT:    GREENBERG TRAURIG, PA
3                           BY:  JACQUELINE BECERRA, ESQ.
                            333 Se 2nd Avenue, Suite 4400
4                           Miami, Florida 33131

5

                            PINERA-VAZQUEZ LAW FIRM
6                           BY:  SILVIA PINERA-VAZQUEZ, ESQ.
                            1900 Sw 3rd Avenue
7                           Miami, Florida 33129

8

9   INTERPRETED BY:         MARIO MICHELENA

10

11  THE COURT REPORTER:     NICOLE CANALES, CSR, RPR
                            225 Cadman Plaza East
12                          Brooklyn, New York 11201
                            cnlsnic@aol.com

13

14  Proceedings recorded by mechanical stenography, transcript
    produced by computer-assisted transcript.

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                3

1          THE CLERK:  Criminal Cause for Motion Hearing,

2    Docket 15CR252, United States versus Jose Marin and Juan Angel

3    Napout.  Will the parties please state their appearances for

4    the record.

5          MR. NITZE:  Sam Nitze, Kristin Mace, Paul Tuchmann,

6    and Keith Edelman for the United States.  Good afternoon,

7    your Honor.

8          THE COURT:  Good afternoon, everyone.

9          MS. PINERA-VAZQUEZ:  Good afternoon, your Honor.

10   Sylvia Piñera and John Pappalardo on behalf of Juan Angel

11   Napout.

12         THE COURT:  Good afternoon.

13         MR. STILLMAN:  Your Honor, Charles Stillman, Jim

14   Mitchell, and Julio Barbosa for Mr. Marin.

15         THE COURT:  Good afternoon to you as well.

16         MS. PINERA-VAZQUEZ:  Your Honor, and, also, I

17   believe on the phone is Mr. Napout and another attorney

18   representing Mr. Napout, Jackie Becerra.

19         MS. BECERRA:  Your Honor, this is Jacqueline

20   Becerra, on behalf of Mr. Napout.  He is with me.  I'm having

21   trouble hearing through the phone.

22         THE COURT:  That's fine.  I think everyone was

23   standing up and not using their microphones a moment ago.

24   I'll instruct everyone to use the mike so that Mr. Napout and

25   Ms. Becerra can hear us.  Can you hear us now?

NICOLE CANALES, CSR, RPR

Proceedings                                   4

1        MS. BECERRA:  It's a little better.

2        THE COURT:  We have two matters to deal with today.

3   I'm only going to require Mr. Napout to be here for the first

4   issue.  In fact, it would be cumbersome to have him here for

5   the entire oral argument.

6        So I'm assuming -- and I'm looking at his attorneys

7   who are here -- that you are still waiving his appearance for

8   the oral argument on the motion; is that right?

9        MR. PAPPALARDO:  Yes, your Honor.

10       THE COURT:  We have an interpreter who is previously

11   sworn.  If you'll state your name for the record.

12       THE INTERPRETER:  Federal-certified Spanish

13   interpreter, Mario Michelena.

14       THE COURT:  Ms. Becerra, can you hear the

15   interpreter?

16       MS. BECERRA:  Yes, we can hear the interpreter

17   clearly.

18       THE COURT:  So good afternoon to you, Mr. Napout, as

19   well.  We have an interpreter here for your use.  Can you hear

20   the interpreter, Mr. Napout?

21       MS. BECERRA:  Yes, I can hear the translation

22   perfectly.  Good afternoon, your Honor.

23       THE COURT:  Can everyone hear the interpreter on

24   this end?  So the first matter I want to take up is the

25   request of the government to have Mr. Napout confirm a waiver

NICOLE CANALES, CSR, RPR

Proceedings                                    5

1    of a challenge and an appeal on an issue that was resolved by

2    Judge Levy.  So the first thing I want to do -- and,

3    Ms. Becerra, if at any point you can't hear the interpreter,

4    just speak up.

5              So I want to summarize the issue that arose first,

6    and then I will advise Mr. Napout of his right to challenge or

7    appeal Judge Levy's ruling.  And then I'll confirm that

8    Mr. Napout waives his right to challenge or approve that

9    decision.  Now, as I'm sure Mr. Napout knows, his attorneys

10   filed a motion based on a claim of attorney-client privilege

11   on his behalf in this case.  And one of the arguments that his

12   attorneys made in favor of that privilege was that a

13   Paraguayan attorney named Esteban Burt, B-u-r-t, represented

14   Mr. Napout but not CONMEBOL.

15             Contrary to Napout's attorney's argument, however,

16   Magistrate Judge Levy, who was asked to decide this issue by

17   the Court, ruled that Mr. Burt, in fact, represented both

18   CONEBOL and Mr. Napout; and that, as a consequence, CONMEBOL

19   possessed the right to waive attorney-client privilege and not

20   Mr. Napout.  Now, let me say that Judge Levy didn't put that

21   on the record, at the time, but that is the necessary

22   consequence of that ruling under the case law.  Now, let me

23   turn to the parties for a moment, because I can see that

24   Mr. Pappalardo is about ready to jump out of his chair.

25             Mr. Pappalardo, do you think that Judge Levy has not

Proceedings                                                        6

1    made that ruling yet?

2            MR. PAPPALARDO:  No, your Honor.  I don't think that

3    was Judge Levy's ruling.  I think Judge Levy ruled that during

4    this period of time, Mr. Burt represented -- both represented

5    Mr. Napout, and at the same period of time represented

6    CONMEBOL.  So to the extent that he was representing CONMEBOL,

7    if CONMEBOL chose to engage in a waiver of the attorney-client

8    privilege with respect to limited subject areas which, as I

9    understand, based upon the filing by the government, has

10   occurred.

11           THE COURT:  Hang on.  Meaning that CONMEBOL has,

12   in fact, waived that privilege?

13           MR. PAPPALARDO:  The papers indicate, your Honor,

14   CONMEBOL has waived the privilege with respect to any

15   investigation that CONMEBOL was taking, but did not waive the

16   privilege with regard to commercial transactions.

17           THE COURT:  Hold on.  That all may be true, but what

18   I'm trying to confirm with Mr. Napout, and make sure he

19   understands, is that the implication of Judge Levy's ruling is

20   that the government has won part of the attorney-client

21   privilege issue, based on Judge Levy's finding that Burt

22   represented both CONMEBOL and him, thereby giving CONMEBOL the

23   right to exercise the waiver that you just mentioned.  And I

24   don't hear you disagreeing with the proposition that based on

25   Judge Levy's finding that both were represented, CONMEBOL is

Proceedings                                              7

1   entitled to waive that attorney-client privilege, as to the

2   investigation.

3         MR. PAPPALARDO:  Your Honor, you're exactly right.

4   CONMEBOL, based upon the ruling, is permitted to waive, and

5   they've executed a limited waiver, with regard to the

6   investigation that was undertaken.

7         THE COURT:  As I understood, from reading the

8   hearing transcript also, the government didn't disagree or

9   didn't object to the notion that CONMEBOL could still, rather,

10  actually -- what I was going to say was that there still

11  wouldn't be a privilege applicable to corporate

12  decision-making, as opposed to the investigation.  But the

13  bottom line is I don't think any of that matters, so long as

14  you don't disagree that the upshot of Judge Levy's ruling is

15  that CONMEBOL is the one who can exercise the privilege or

16  decide to waive it, rather.

17        MR. PAPPALARDO:  If I may, your Honor?

18        THE COURT:  Yes.

19        MR. PAPPALARDO:  The hearing before Judge Levy was

20  intended to produce evidence to establish that there was a

21  common interest agreement regarding one thing and one thing

22  only.  And that common interest agreement was in place, as

23  argued by us, to protect the conversations and communications

24  by Mr. Burt, as it related strictly to commercial

25  transactions.  At the beginning of the hearing, your Honor, it

Proceedings                                    8

1   was clear that CONMEBOL was not waiving the privilege with
2   regard to commercial transactions, and so the communications
3   regarding them are still privileged.
4            THE COURT:  That may be true, but, again, I think
5   it's beside the point.  The only reason that I am advising
6   Mr. Napout about this issue that was presented to Judge Levy
7   is that he understand that the consequence of Judge Levy's
8   ruling, is that it's CONMEBOL who decides whether to waive any
9   privilege or not, and not Mr. Napout, because the privilege
10  belongs to CONMEBOL.
11           MR. PAPPALARDO:  Your Honor, I would disagree with
12  that, and I don't think that's Judge Levy's ruling.  I think
13  that to the extent that Mr. Napout was representing CONMEBOL,
14  CONMEBOL can waive.  Mr. Burt, your Honor, not Mr. Napout.
15  Having said that, your Honor, confidential communications
16  between Mr. Burt and Mr. Napout are not subject to that
17  ruling, having nothing to do with CONMEBOL.
18           THE COURT:  I'm going to look to the government for
19  a minute.  I know there was a reference to that issue towards
20  the end of the hearing; I think you raised it.  But all I can
21  say is that in order for Mr. Napout, in my mind, to give a
22  fully informed waiver, I have to be able to advise him about
23  what the implication is of Judge Levy's finding that Mr. Burt
24  represented both CONMEBOL and Napout during the relevant
25  period of time, which is -- now, maybe there is some argument

Proceedings                                          9

1    about what the scope of that co-representation is, or whether

2    or not it doesn't necessarily give CONMEBOL the right to waive

3    privilege to some conversations, or not.

4         But I think if there's some dispute about that

5    still, I'm not sure any waiver that Mr. Napout gives today

6    will go very far; because he may agree not to appeal Judge

7    Levy's ruling, but he still may want to appeal the decision

8    about the application of the attorney-client privilege

9    doctrine.

10        MR. PAPPALARDO:  If I may, your Honor?

11        THE COURT:  Go ahead.

12        MR. PAPPALARDO:  If I represent two clients,

13   your Honor, and it's clear that I represent both, one client

14   cannot waive confidential communications that exist with the

15   other client.  As an example, if they're solely for the other

16   client.  In this case, your Honor, I do think it is very

17   clear -- and you can ask Mr. Napout -- that he does not intend

18   to appeal the ruling.  What this has to do with is a practical

19   application of going through the documents that were taken

20   from CONMEBOL to determine whether or not they were personal

21   to Napout or to CONMEBOL.

22        THE COURT:  So let me turn to the government for a

23   minute, because this is your application, in a way.  Would it

24   suffice, from your point of view, simply to have Mr. Napout

25   confirm that he does not intend to challenge Judge Levy's --

Proceedings                              10

1    I'll characterize it as limited ruling or limited finding that
2    Mr. Burt represented both CONMEBOL and Mr. Napout during the
3    relevant period of time?  And then leave it to the parties to
4    continue to fight over what that means, in terms of coverage
5    of any waiver or existing surviving privilege.
6            MS. MACE:  Thank you, your Honor.  Yes.
7            THE COURT:  Have a seat, and use the microphone.
8    Speak really loudly.
9            MS. MACE:  Just a couple quick clarifying points,
10   with regard to a waiver by CONMEBOL, I don't think there's any
11   need to put on the record today the scope of that waiver,
12   because that's CONMEBOL's, and it can change its position at
13   any time.  I agree with Mr. Pappalardo that Judge Levy did not
14   rule on the application of his findings and decision as to
15   specific documents.  What the government requests today is
16   that the defendant confirm that he doesn't request a written
17   ruling from Judge Levy, because he understands the bases of
18   Judge Levy's ruling, and also that the defendant will not
19   challenge or appeal the ruling that Mr. Burt represented both
20   CONMEBOL and Mr. Napout.
21           THE COURT:  During the relevant period of time.
22           MS. MACE:  From May 27th, 2015, through April 2016.
23   And to that end, the government has prepared a set of
24   questions, that I have shown to defense counsel as well, that
25   we think would accomplish what is necessary here to have the

NICOLE CANALES, CSR, RPR

1   record clear.  I haven't heard yet whether or not they agree

2   to these questions, but I'd be happy to hand them up, if that

3   would be of assistance.

4            THE COURT:  Any objection, Mr. Pappalardo?

5            MR. PAPPALARDO:  Yes, your Honor.  I think the --

6   I'll sit down.  I think the only thing for this court to

7   determine today is whether or not Mr. Napout intends to appeal

8   the ruling.  What he was shown -- as an example, your Honor,

9   question two is -- you know, intrudes upon the attorney-client

10  privilege, in and of itself.  I believe the question for

11  the Court would be:  Do you have conversation with your

12  counsel?  Based upon that conversation, are you satisfied that

13  you understand what transpired?  And based upon that

14  understanding, knowing that you have a right to appeal, do you

15  wish to appeal?

16           THE COURT:  Okay.  Folks, this is a situation of too

17  many cooks in the kitchen.  I was going to do this a little

18  more directly.  I'm happy to get the input, to be sure.  So

19  I'm going to use a little of what everyone suggests.

20           Mr. Napout, first of all, do you read or speak any

21  English?

22           DEFENDANT NAPOUT:  Yes.  Yes.  Some, yes, I can.

23           THE COURT:  Okay.  Have you understood some of

24  what's been said in English?

25           DEFENDANT NAPOUT:  Yes, some.  Yes, some.

Proceedings                                    12

1          THE COURT:  Have you had any difficulty

2    understanding the Spanish-language interpreter?

3          DEFENDANT NAPOUT:  No, no, no.  None, whatsoever.

4          THE COURT:  Now, are you aware that there was a

5    hearing before Magistrate Judge Levy on the attorney-client

6    privilege issue?

7          DEFENDANT NAPOUT:  Yes, I was completely aware of

8    that.

9          THE COURT:  Okay.  And were you aware that one of

10   the issues that your lawyers raised with Judge Levy was the

11   question of whether Mr. Burt represented both you and CONMEBOL

12   during the relevant period of time?

13         DEFENDANT NAPOUT:  Yes, I was aware of that.

14         THE COURT:  And the period of time that was

15   referenced was May 27th, 2015, through April 2016.  Was that

16   your understanding?

17         DEFENDANT NAPOUT:  Yes, that was my understanding

18   also.

19         THE COURT:  And are you also aware that Judge Levy

20   ruled against your attorney's position and decided that

21   Mr. Burt did represent both you and CONMEBOL during that

22   period of time?

23         DEFENDANT NAPOUT:  Yes, I'm aware of that.

24         THE COURT:  Are you aware of the reasons or the

25   grounds upon which Judge Levy made that decision?

                          Proceedings                    13

1              DEFENDANT NAPOUT:  Yes, I am also aware of that.

2              THE COURT:  Okay.  And do you understand also that

3      one possible implication of Judge Levy's ruling is that

4      CONMEBOL will be able to decide whether to waive any

5      attorney-client privilege that might apply here?

6              DEFENDANT NAPOUT:  Yes, I am completely aware of

7      that.

8              THE COURT:  And that waiver, if they choose to do

9      that, could be over your objection.

10             DEFENDANT NAPOUT:  Yes, in a limited fashion, as I

11     heard a moment ago.

12             THE COURT:  Okay.  Now, are you aware that you have

13     the right to challenge, on the first level, Judge Levy's

14     ruling to me?  And by that ruling, I mean his finding that

15     Mr. Burt represented both you and CONMEBOL.

16             DEFENDANT NAPOUT:  Yes, I am aware of that also.

17             THE COURT:  And are you aware that if I were to rule

18     as Judge Levy did, you could further challenge that,

19     potentially, to a court of appeal?

20             DEFENDANT NAPOUT:  Yes, I am aware of that also.

21             THE COURT:  And is it your desire to give up that

22     right to challenge Judge Levy's ruling, both to me and to any

23     court of appeal?

24             DEFENDANT NAPOUT:  Yes, that's exactly how it is.

25             THE COURT:  Also, Judge Levy had discussed with the

Proceedings                                          14

1    parties the possibility that he would reduce to writing his

2    finding about Mr. Burt's representation of both you and

3    CONMEBOL.  And if Judge Levy did that, he would put some

4    detail into the decision about the grounds for his ruling.

5    And is it your understanding that your attorneys told

6    Judge Levy that they did not want him -- they were not asking

7    him to put down his decision in writing?  Did you understand

8    that?

9              DEFENDANT NAPOUT:  Yes, I did understand that.  I am

10   aware of that.

11             THE COURT:  Okay.  Do you agree with that decision

12   not to have Judge Levy's decision put into writing, on this

13   issue about Mr. Burt representing both you and CONMEBOL?

14             DEFENDANT NAPOUT:  Yes.  I agree completely.  Yes.

15             THE COURT:  Is there anything else that the

16   government would have him put on the record?

17             MS. MACE:  No, your Honor.  I think that's

18   sufficient.  Thank you.

19             THE COURT:  Mr. Pappalardo, any clarification

20   required?

21             MR. PAPPALARDO:  Not of this colloquy, no.

22             THE COURT:  All right.  Terrific.  So that concludes

23   the first part of this proceeding.  And, Mr. Napout, you are

24   free to hang up.  If you'd like, at a minimum, though, I'm not

25   going to require the interpreter to continue to interpret the

1   entire rest of the proceeding.  Thanks very much, Ms. Becerra,

2   and thank you, Mr. Napout.

3            DEFENDANT NAPOUT:  Thank you very much, your Honor.

4            THE COURT:  Did you want to disconnect, Ms. Becerra?

5            MS. BECERRA:  I think we're going to disconnect,

6   because it would be hard for him to hear the parties in

7   English.  So we'll disconnect.

8            THE COURT:  Thank you so much.

9            Let's get to the main act here, which is the oral

10  argument on Defendant Marin's and Defendant Napout's motion to

11  dismiss, which set forth different bases.  So the way we'll

12  proceed is, I'll let Mr. Marin's attorneys go first with their

13  argument, and then let the government respond, and then have

14  Mr. Napout's attorneys go next, and have the government

15  respond to those.

16           Mr. Stillman.

17           MR. STILLMAN:  Your Honor, most of what we have to

18  say today, your Honor, is spelled out in our papers, and I'm

19  certainly not going to burden you with repeating that.  I

20  think I want to make a couple of observations while we're

21  here.  And, also, I don't know whether or not your Honor has

22  seen this; actually, it's helpful.  We found it the other day

23  on a government website, and so what it has is a list of the

24  defendants -- I'll call it your case, because it's now in

25  front of you, your Honor, and the status of those cases, and

Proceedings                                    16

1    then there's also a thing called additional cases.  You guys,

2    I'm sure have seen this, right?  And it has the other

3    individuals who have entered pleas to, I assume, the related

4    case.  I'm happy to hand that up, your Honor, to you, in case

5    you haven't seen it.

6                THE COURT:  I haven't seen what you're referring to,

7    I don't believe, but I think I'm pretty aware --

8                MR. STILLMAN:  It's the first time I've seen it in

9    two pages, and it seemed helpful.  That's all.

10               THE COURT:  Go ahead.  Does the government have any

11   objection to my looking at this?

12               MR. NITZE:  We've seen it.

13               THE COURT:  I think you may have produced it.

14               MR. STILLMAN:  Sorry about that.  So when you go

15   through that, your Honor, what you see is -- in the

16   Superseding Indictment, there are 27, I think, named

17   defendants, of whom 15 have appeared, 10 have entered guilty

18   pleas, and there are 5 left scheduled for trial, on November

19   the 6th of this year.

20               THE COURT:  You're right.

21               MR. STILLMAN:  And the second page of the document

22   reflects, your Honor, that there were ten individuals who

23   pleaded guilty to, I'm sure, some aspect of what we're all

24   here about, and there's one corporate-deferred prosecution.

25               THE COURT:  Right.

NICOLE CANALES, CSR, RPR

```
                        Proceedings                      17
```

1          MR. STILLMAN:  Now, in a sense, your Honor, when you

2    see all that has happened, one would think that, well, we're

3    down five, and this is going to be a short trial that

4    your Honor could knock off in a week, you know.

5          THE COURT:  God willing, yes.

6          MR. STILLMAN:  I don't think that's the reality, so

7    you kind of ask yourself what's the reality?  The reality is

8    that you come to the first charge of this indictment, the

9    indictment reading 235 pages, and it's all about the RICO

10   charge, so it's the RICO charge that we address in our motion,

11   your Honor.  And, as I get it, it's a classic hub and spoke.

12   I think that's the parlance of the day, the hub being, FIFA.

13   Your Honor knows what that is.  FIFA, the hub and the spokes,

14   are the various confederations; CONMEBOL, CONCACAF, UEFA -- I

15   don't know how to say that -- CAF, and AFC, and OFC.

16          And so assuming that I'm correct, your Honor, that

17   the analysis is the hub-and-spoke conspiracy, the point that

18   we make in our motion, and the reason that we bring this on

19   before you, is that this is a wheel without a rim.  And it is

20   the absence of the rim, your Honor, that drives our motion to

21   dismiss, at this time.

22          THE COURT:  Yes.

23          MR. STILLMAN:  And in the absence of the rim, we

24   need to look at what is the relationship, what is the

25   relationship, between my client, Jose Maria Marin, going on

Proceedings                                    18

1   85 years of age, now faced with this rimless RICO conspiracy
2   charge that's going to have him in federal court for, I have
3   heard -- the lowest number I heard was 6 weeks, and if I had
4   to put a nickel down, I'd tell you, in spite of our best
5   efforts, it would be longer than 6 weeks.  But that's neither
6   here nor there, for the moment, your Honor.
7              And so when I look at the absence, the absence of
8   this rim, your Honor, the government -- one of the things the
9   government says is, well, look at -- there was a tournament
10  called Copa América.  And Copa América, apparently,
11  your Honor, the CONMEBOL confederation, together with the
12  CONCACAF confederation, got together and they did a
13  tournament.  And so the government says that begins to give
14  you some of the rim.  Well, it is kind of ironic that the
15  government would say that, because that tournament took place
16  once in a hundred years, so you kind of wonder where that
17  connection comes from.
18             And so my point is, your Honor, that even if you
19  took that and you put that on the rim, you couldn't drive this
20  wheel very far, because it would collapse, in as much as the
21  legs of the -- the spokes of this rim really don't come
22  together.  And so the government says, well, sorry, Stillman,
23  you didn't look at our indictment.  Didn't we state in our
24  indictment that these groups conducted business with one
25  another and they worked together?  And they say, well, the

NICOLE CANALES, CSR, RPR

1    case law says that's enough for us.  We've said that, and

2    we'll see you in court.

3           And if you're right, at the end of the trial, and

4    you make your Rule 29 motion, and we were wrong and you were

5    right, you walk away from the courtroom.  And the reason I

6    made this motion, your Honor -- and we understand, you know,

7    this is a long time.  I understand I have the uphill battle on

8    this point, but I felt sufficiently strong about it that I

9    thought we should bring it to your attention, at this time.

10   Look, I understand the U.S. Attorney's Manual doesn't bind

11   them, as a legal proposition, but it's certainly instructive

12   to look at the manual when the manual says that in these

13   situations -- they're saying to the troops, you know, the

14   lawyers representing them, you know, give some detail here

15   when you're doing one of these RICO cases.

16          That's my simplistic way of making the point, but I

17   think it makes the point kind of well, your Honor.  And the

18   fact of the matter is they haven't done that here.  So Jose

19   Maria Marin, and myself, Jim, and Julio Barbosa are left to

20   put our defense together, recognizing that we're going to be

21   facing this very lengthy trial, with what looks to be a real

22   flaw that comes out at the end, and we raise it at the end and

23   we win, okay, wonderful.  But what I'm trying to do is avoid

24   that, but not avoid a trial, your Honor.  I think it's

25   important for you to have our position on this very clear.

```
                         Proceedings                    20
```

1           At the end of the day, your Honor, our view is that

2    you dismiss the RICO, and there will be a trial.  There will

3    be a trial of Jose Maria Marin on six very serious federal

4    criminal charges, and, indeed, one of those have three

5    tournaments, so to speak, your Honor, and two charges for

6    each, a wire fraud and a money laundering for each.  And when

7    you look at them, and if he gets convicted of any or all, he's

8    facing substantial federal prison time.  So I guess what I'm

9    saying is the RICO should go.  I'm not saying it's a walk in

10   the park for him; there's still a battle ahead.

11          But there's a battle, your Honor, that frees us from

12   having to deal with the RICO conspiracy that they say lasted

13   25 years, that spanned continents, that Marin may never have

14   walked on but certainly never conspired on.  There will be no

15   evidence that he had anything to do with any of those other

16   things.  And as I said, he will stand trial.  He'll have to

17   stand trial on their theory of the Copa América tournament and

18   any alleged corruption they say happened there, and he'll have

19   to answer charges.

20          Our presentation to your Honor, by dismissing -- I

21   understand, you know, as I was putting this together -- and

22   the reason I handed that document up to you is that -- so here

23   I am moving to dismiss a RICO count that 15 people have said

24   they're guilty.  So you can say, Stillman, look, everybody

25   else seems to have no trouble with that; how come you have

1   trouble with it?  And the reason we have trouble with it,

2   your Honor, is because it is as it affects Jose Maria Marin,

3   and it is on that basis, as we spell out in our papers, we

4   would urge your Honor to dismiss Count One as to Mr. Marin.

5   Thank you.

6            THE COURT:  Can I ask you a question, though?  I

7   must confess when I read -- it's a metaphorical question, in

8   the sense that I'm asking you about your metaphor.  You use

9   this rimless wheel, and I have to admit I had some trouble

10  understanding exactly what you meant.  You mean there's no

11  connection that keeps this conspiracy together, in your mind.

12           MR. STILLMAN:  I'll tell you exactly when.  And

13  you'll laugh at me, so I won't tell you.  The first time I saw

14  a conspiracy case, I was a 22-year-old kid, working for a

15  federal judge, and still in law school.  And the reading, as

16  conspiracy law evolved -- your basic conspiracy, you know, I

17  get together with my partners over there, and we have a

18  conspiracy.  But things became more complicated.  The way this

19  indictment is structured, the theory of this case, is you have

20  FIFA, this federation of soccer, and paragraphs about the

21  great things they're doing for soccer, this great sport

22  that -- it's really a bigger sport outside of America, but it

23  is in America, at least now.

24           And then you have these confederations; one in

25  Africa, and one for South America, and one for Central

Proceedings                                    22

1    America.  And so where they connected, they're connected at

2    the center, because they're all hooked into FIFA; they go to

3    FIFA meetings, and they do all these FIFA meetings.  But

4    insofar as the allegations of corruption, of taking all this

5    money, and cheating, and lying, and all that stuff, that, if

6    you look at this, the way the government has -- the way this

7    is structured, and the way this plays out, is it happened

8    separately in each of those six spokes of the wheel.

9         And there's never, that piece of evidence, at least

10   alleged in this -- that I see in this case, is somebody says,

11   hey, let's get the six groups together, let's sit down, let's

12   talk, let's plan, conspire together, so that the rim now sits

13   on the wheel, on the spokes.  And it just doesn't exist here,

14   your Honor; that's the reason for the metaphor.  And I believe

15   that that's -- you'll find case law that talks about it as

16   well.

17        THE COURT:  But isn't RICO conspiracy different,

18   exactly, in that way, in that to allege sufficiently --

19   because we're talking about allegations versus proof, which is

20   one of the problems I have with your motion; is that you seem

21   to be focused on allegations of specific evidence or proof,

22   because there's no question here that this is a very detailed

23   indictment.  It spans hundreds of pages; right?

24        MR. STILLMAN:  Two hundred and thirty-five

25   paragraphs.

Proceedings                                23

1          THE COURT:  But to allege an enterprise, really, it
2     just has to be an association in fact.  It doesn't necessarily
3     have to all have worked together on these particular corrupt
4     events or predicate acts, per se; and there are many
5     paragraphs in the indictment about how FIFA did work together,
6     and had all these constituent groups, of which your client was
7     an official for one of them.  And so I think the battle you're
8     fighting is a bit like tilting at windmills, maybe, because
9     this is why RICO was structured, I think, the way it is.  It's
10    not your typical conspiracy, necessarily, the hub and spoke
11    you describe, but it really is a much more overarching
12    concept, isn't it, in the way it's written.
13         MR. STILLMAN:  In some sense, that's right.  And
14    it's interesting that your Honor uses windmill, because
15    windmill is another --
16         THE COURT:  Another round thing that spins.
17         MR. STILLMAN:  So it's kind of another illusion.
18    I'll use that term.
19         THE COURT:  We should stop.
20         MR. STILLMAN:  I would say the government is tilting
21    those things.  But sorry.
22         THE COURT:  Perhaps.
23         MR. STILLMAN:  The point, your Honor, is --
24         THE COURT:  That could be their Exhibit Number 1.
25         MR. STILLMAN:  The Supreme Court in the *Boyle* case

NICOLE CANALES, CSR, RPR

Proceedings                                    24

1    spoke to that; talks about that there are three factors of the

2    association in fact required for RICO.  And then *Boyle* said

3    for purpose, purpose, do bad things in soccer; second,

4    relationships among those associated with the enterprise; and,

5    third, longevity.  So, one, the purpose:  Do bad things in

6    soccer.  Longevity:  Twenty-five years.

7              So the issue that we turn to, your Honor, is

8    relationships among those associated; that's our point.  Our

9    point is that to the extent that Jose Maria Marin was

10   associated with anybody, in what he's alleged to have done,

11   his association was limited to his spoke -- to that spoke,

12   your Honor.  He wasn't associated with any of the other people

13   involved in the other spokes.

14             THE COURT:  But you don't disagree -- because I

15   think you're acknowledging you have an uphill battle -- that

16   the allegations in the indictment say all the things they need

17   to say, in terms of there was, in fact, this association and

18   communication; you just don't agree that that's what they're

19   going to be able to prove, but in terms of the pleading of the

20   indictment, is there really some defect you can point to,

21   other than you don't think the government will be able to

22   prove it?

23             MR. STILLMAN:  Your Honor, the defect I point to is

24   the failure to put in sufficient -- so that when your Honor

25   looks at this, and we're down the road, and we're on trial,

Proceedings                                        25

1    and it's now -- we're into December and wondering whether

2    we're going to have a Christmas recess during the trial,

3    wondering whether or not -- where's the evidence that gives

4    you that rim to the other spoke, your Honor, and I suggest --

5              THE COURT:  But that's what discovery is for.

6              MR. STILLMAN:  I get all that, but I'm saying, if

7    you said to me, look, Stillman, if you want Marin to go home

8    and that's the end of the case, he doesn't go home, he has to

9    sit in a federal courtroom and defend six federal charges.

10             THE COURT:  He just doesn't want to have to defend

11   this one.

12             MR. STILLMAN:  Yes, ma'am.

13             THE COURT:  All right.  Mr. Nitze or Ms. Mace.

14             MR. NITZE:  Yes, your Honor, just briefly.  First,

15   RICO conspiracy is a separate offense from the others, and

16   that the defendant faces six other serious federal felonies

17   doesn't say anything about whether the RICO conspiracy itself

18   is properly charged, and the government believes it is.  We

19   understand the crux of Mr. Stillman's argument to be that --

20   well, first of all, it is not a hub-and-spoke conspiracy; it's

21   an association in fact enterprise that's been alleged, and we

22   understand the crux of the argument to be that it's not

23   properly alleged; that there's not enough connectivity among

24   confederations, for example, to sustain the pleadings.

25             And the indictment, if you want me to repeat all

Proceedings                                          26

1    that's in our papers, but there are many allegations

2    sufficient to meet that requirement in the charging

3    instrument.  The indictment alleges that the members

4    functioned as a continuing unit; that the congress of FIFA is

5    made up of its -- representatives of its member associations;

6    that the confederations appoint vice presidents and ordinary

7    members to the Executive Committee.  These are people sitting

8    down together to conduct the business of FIFA and other

9    confederations together.

10            The six Continental confederations worked closely

11   with FIFA and with one another.  They organize international

12   soccer competitions on a regional basis, sometimes cooperating

13   and coordinating with one other.  Over time, the organizations

14   formed to promote and govern soccer and the regions -- and

15   that includes the sports marketing companies that produce the

16   games and put them on television for people to watch -- became

17   increasingly intertwined with one other and with the sports

18   marketing companies.  The elements of the association in fact

19   enterprise are alleged to work together.

20            The *Boyle* case cited by the defense sets forth some

21   minimal requirements that must be alleged.  We easily satisfy

22   *Boyle*, and, in fact, *Boyle* lifts a whole set of requirements

23   that are not presented by a proper racketeering charge,

24   structure, and hierarchy, and certain organizational elements

25   that needn't be alleged.

Proceedings                              27

1        THE COURT:  One question for you, though,

2   Mr. Stillman said it has to have a common bad purpose; I don't

3   think that's what *Boyle* says.  It just has to have a common

4   purpose; right?

5        MR. NITZE:  An enterprise may have a lawful and

6   legitimate purpose and be corrupted by the people who conduct

7   the affairs of the enterprise or conspire to do it through a

8   pattern of racketeering activity.  So they bring in criminal

9   conduct into the affairs of an enterprise.  The enterprise's

10  stated goal and purpose needn't be, on its face, criminal.

11  And, here, certainly FIFA and the world's governing bodies of

12  soccer and sport marketing companies are not conceptually --

13        THE COURT:  -- out to do evil.

14        MR. NITZE:  They've been victimized by -- the theory

15  of the government's case is that the governing bodies, FIFA,

16  and the confederations, and the associations have been

17  victimized by the conduct.

18        THE COURT:  Did you want to respond at all,

19  Mr. Stillman?  Come up with any more round objects?  I'm

20  kidding.

21        MR. STILLMAN:  I just want to say this, your Honor,

22  as I listen to Mr. Nitze, your Honor, I mean, with all of that

23  governing and all of that cooperating, and maybe if you don't

24  like my rim and spoke, spoke and whatever it is --

25        THE COURT:  Hub and spoke.

Proceedings                                    28

1          MR. STILLMAN:  Then, as I listen, it's kind of like

2    silos, because you have -- each of these confederations,

3    there's a silo.  And I read the cases, too.  I see what the

4    cases are saying, but it just strikes me, your Honor, that you

5    would think that there would be some allegations -- something

6    in this 235-paragraph indictment that would give you some

7    information, some step to show you that there was -- that this

8    corruption, this terrible thing -- and those things happen,

9    and they are terrible things, but that there was some

10   coordination among the confederations, so that you could have

11   some comfort in knowing that this was one RICO conspiracy,

12   rather than several RICO conspiracies.  Thank you.

13         THE COURT:  One last question I have for you, you

14   did also argue duplicity.

15         MR. STILLMAN:  Duplicity, really -- if your Honor

16   grants our motion, then the duplicity argument falls away.  I

17   would put it down as a make-weight argument and wouldn't worry

18   too much about it.

19         THE COURT:  I won't worry myself about that one.

20         Mr. Pappalardo.

21         MS. PINERA-VAZQUEZ:  Ms. Piñera-Vazquez.  Thank you,

22   Judge.  Judge, we're a little more ambitious than

23   Mr. Stillman.

24         THE COURT:  How dare you say that to poor

25   Mr. Stillman.

Proceedings                                29

1        MS. PINERA-VAZQUEZ:  A little bit more ambitious.

2   Just a tad.  We submit that all five counts on which our

3   client has been charged should be dismissed, because the

4   Superseding Indictment does not allege sufficient allegations

5   to apply extraterritorial jurisdiction.  It's a bit more of a

6   technical issue.  But as I spent yesterday, for many hours,

7   watching what was going on in the news and trying to do this,

8   I realize it can be simplified, and that's what I hope to do

9   today, in order to add what we filed in our pleadings.  I'm

10  going to be brief, because I don't want to repeat, and I'm

11  going to go to the crux of the problem.  You have a question?

12  Go ahead.

13       THE COURT:  I think the simple version of it in my

14  mind is -- I would have to agree with you that the wire fraud

15  alleged is not a proper domestic application of the statute, I

16  think, to agree with five six of your argument.  And then the

17  last part of it would be, it would be unreasonable, in any

18  event, because it seems to me your arguments sort of collapsed

19  one onto the other.  If the wire fraud that's charged, the

20  wire fraud conspiracy, is not a proper domestic application,

21  you then argue that it doesn't constitute a proper SUA for the

22  money laundering; right?  And, then, the whole RICO charge

23  collapses because of those two charges collapsing.  That's

24  sort of it, in a nutshell; right?

25       MS. PINERA-VAZQUEZ:  As to Mr. Napout, the predicate

1    acts as to the RICO were money laundering and wire fraud.

2            THE COURT:  Focus on why it's not a proper domestic

3    application on the wire fraud statute, as to Mr. Napout.

4            MS. PINERA-VAZQUEZ:  Then I take it the Court wants

5    me to address the second step of the *RJR Nabisco* case.  And I

6    think before I answer the question, I'd like to point out that

7    the *RJR Nabisco* case and the *Microsoft* case were both decided

8    in June and July of 2016, were decided after that Superseding

9    Indictment was returned, in December of 2015.  And I think

10   that's important to note, because the law did change in that

11   *RJR Nabisco* case.  With your specific question as to the wire

12   fraud, because you're absolutely right, our argument either

13   rises or falls on the wire fraud.

14           The *RJR Nabisco* case, in the 2nd Circuit, before it

15   went up to the Supreme Court, specifically held that wire

16   fraud could not be a basis by which to apply the domestic

17   application of -- could not be applied extraterritorially.

18   What does the court say?  The courts say we have to look at

19   the focus, the focus of the wire fraud statute, which would be

20   the second step of *RJR Nabisco*.  Because Congress never said

21   that wire fraud was specifically to be applied territorially,

22   then, in this case, what conduct -- and I want to get the

23   language correct, exactly right.  The question becomes what is

24   the focus of the wire fraud statute?  That's the relevant

25   question; what is the focus of the wire fraud statute?

Proceedings                                    31

1          Now, specifically as to Mr. Napout, I think it's

2    important, because there's 27 defendants, 26 of which are all

3    foreign nationals, involving a foreign conspiracy, involving

4    foreign-born victims.  So I think it's really important to be

5    specific as to Mr. Napout, who was a foreign national from

6    Paraguay.  What is the focus of the wire fraud statute as to

7    Mr. Napout?  Well, we can't assume what Congress would have

8    wanted; we have to look at what makes sense.  The focus from

9    the wire fraud statute case was that, as I was able to locate,

10   is really not the actual use of the wire but where was the

11   scheme to defraud?  It's a protection of the fraud.  That's

12   the focus of the statute.

13         THE COURT:  Let me stop you for a moment.  You add

14   this additional qualifier; what is the focus of the wire fraud

15   statute as to Mr. Napout?  The last three words are what I'm

16   focusing on.  The analysis seems to be what is the focus of

17   the wire fraud statute period.  Does it have to be specific to

18   the application in this case?  Do you know what I'm saying?

19         MS. PINERA-VAZQUEZ:  It has to be sufficient as to

20   the allegations related to Mr. Napout in the Superseding

21   Indictment.  In other words, the question is --

22         THE COURT:  Do the allegations in this case satisfy

23   whatever the focus is, in other words, address whatever the

24   focus is in the wire fraud statute?

25         MS. PINERA-VAZQUEZ:  Exactly.  Yes, your Honor.  So

NICOLE CANALES, CSR, RPR

Proceedings                                    32

1    our position in this case is that the government has not

2    alleged sufficient -- specific facts.  They've alleged

3    conclusionary allegations, conclusions.  They have not alleged

4    specific facts or allegations to overcome the application of

5    the wire fraud statute extraterritorially.  What's important

6    about that, Judge, is in the indictment -- and I think

7    Mr. Stillman pointed out, yes, it's a 265-page indictment with

8    92 counts, 27 defendants, 15 schemes, and that sort of gives

9    the impression that it's detailed.

10           It may be detailed, generally, but it's not detailed

11   as to my client, Mr. Napout.  The allegations as to Mr. Napout

12   are all conclusory, in that they bunch him in with, for

13   example, Copa Libertadores.  They bunch him in with a group of

14   six.  Yet, they don't specify how -- and I'm not saying

15   specify in detail; they just have to give more than

16   conclusionary allegations to apply the wire fraud statute

17   extraterritorially.  And I think it's important to point out

18   that the courts have held, in assessing the focus of the wire

19   fraud statute, that it's also important for the court to look

20   at the elements of the wire fraud statute and where those

21   elements took place.

22           And I'm sure the Court's aware that the three

23   elements are the formation of a scheme, to defraud victims of

24   money, and the use of the wire communication in furtherance of

25   the scheme.  In this case, according to the allegations in the

1   indictment, the scheme to defraud the victims was not formed

2   in the United States; it was formed outside the United States.

3   There's not one allegation as to Mr. Napout that the scheme

4   was formed in the United States.

5          And the money, which will be to defraud the victims

6   of money, where are the victims?  The victims are not in the

7   United States, because the United States government is not a

8   victim in this case.  According to the government, the victims

9   in this case, allegedly, are FIFA, which is based in

10  Switzerland; CONMEBOL, which is based in Paraguay; CONCACAF,

11  which, I think, may be in Trinidad.  I'm not sure where the

12  base is right now.  And the other international organizations.

13  So the victims are not in the United States.

14         The only potential use or connection to United

15  States would be the use of the wires.  This is important,

16  because if you notice in the indictment, the government hinges

17  its entire argument on the use of the banking system in the

18  United States.  I mean, that's what it boils down to.  How on

19  earth does the United States become involved in a game of

20  soccer, an international sport that before the last 20 years

21  didn't even exist in the United States?  Didn't exist.

22         How did they become involved and all of a sudden

23  bring the heads of all of these powerful organizations -- who

24  in many of their countries commercial bribery is not even a

25  crime, how do they get them and bring them to the United

Proceedings                                    34

1  States, pick them up and bring them over here?  Some of them

2  had bank accounts in the United States.  Leoz had an account

3  in Merrill Lynch; somebody else had an account in Citibank,

4  and they used those wires to transfer money.  I've seen

5  e-mails from Torneos, which, in this case, was a marketing

6  company headed by Alejandro Burzalo, who basically was based

7  in Argentina.  This is important, your Honor.  Just give me a

8  second.

9           THE COURT:  I'm only looking at our court reporter.

10  You're using a lot of words --

11           MS. PINERA-VAZQUEZ:  I'll stay and spell.

12           THE COURT:  Just pause.  If you use a word like

13  Libertadores, which I can't pronounce nearly as well, you have

14  to stop and spell it out.

15           MS. PINERA-VAZQUEZ:  I will.

16           THE COURT:  Just take a breath.  Take your time.

17           MS. PINERA-VAZQUEZ:  Okay.  So the question becomes

18  how does Torneos, T-o-r-n-e-o-s, that is a sports marketing

19  company based in Argentina, Buenos Aires, headed by Alejandro

20  Burzalo, who is an Argentinian citizen, who is basically,

21  according to the allegations in the indictment -- that's what

22  I'm going to focus on -- supposedly paying bribes to these

23  individuals all over the world to secure marketing rights?

24  Now, none of these people are government employees.  There's a

25  C.P.A. that is not implicated, just basically these heads of

NICOLE CANALES, CSR, RPR

Proceedings                                                35

1   soccer organizations.  And now I lost my train of thought
2   before.
3        THE COURT:  I think you were trying to say none of
4   this happens in the U.S.
5        MS. PINERA-VAZQUEZ:  I'll go back to this -- I was
6   thinking of the spelling.  What happens?  The only way the
7   government gets the hook is the banking system.  Now, what's
8   really important as to Mr. Napout is that there's not one
9   allegation in the indictment that Mr. Napout either used any
10  bank in the United States to receive, transfer, or deposit
11  money.  None.  And that's important, when you look at the
12  other defendants, because in the indictment there are
13  allegations as to other defendants and the use of the wires.
14  That's not alleged in this indictment as to our client.
15       So if you look at it that way, the formation of the
16  scheme to defraud the victims, which is the Copa Libertadores
17  scheme, the CONMEBOL, which did not take place in the United
18  States -- it took place outside of the United States, in
19  South America, and the victims would have been CONMEBOL, which
20  also took place -- is an entity outside of the United States,
21  and there's no allegation that Mr. Napout used any wire
22  communication in furtherance of the scheme.  That, along with
23  the money laundering, based upon which -- I understand
24  your Honor also understood the argument, because they use wire
25  fraud as the specified unlawful activity to support the

1    laundering of the proceeds of the CONMEBOL.

2          Those two counts were false because they don't

3    have -- under *RJR Nabisco* and the *Microsoft* case, there's not

4    enough -- the focus of the wire fraud statute cannot be --

5    doesn't have domestic application, and that's the same thing

6    for the other scheme that Mr. Napout is charged in, which is

7    the Copa América scheme.  Again, the same thing; there's no

8    allegation in the indictment that the scheme was formed in the

9    United States, that the victims are U.S. either residents or

10   citizens.  They're all foreign entities.

11         It's important, because you can be a victim and you

12   don't have to be a U.S. citizen, but it's overwhelming in this

13   case.  There are no U.S. victims.  In this case, all the

14   victims are, according to the indictment, FIFA, CONMEBOL,

15   CONCACAF.  Those are the victims.  And I don't know if you

16   have any other questions, but I think what's really important

17   here -- and I hope I say this word right, but in *RJR Nabisco*,

18   the court, Judge Alito, for the majority, and I believe it was

19   a five-four decision, says something that is so emblematic in

20   this case.

21         He says the United States governs domestically, but

22   it does not rule the world, and that, in this case, is what

23   the government sought to do, rule the world of soccer.  Why?

24   According to the indictment, because some of the banking

25   systems were used.  That's how they get their hook in the door

Proceedings                          37

1   as to the entire indictment.  But as far as Mr. Napout, there

2   isn't sufficient evidence to overcome the presumption of not

3   applying domestic laws extraterritorially.

4          THE COURT:  Let me ask you, though -- I know the

5   government has argued to some extent that they need only show

6   the use of the wires, and that's enough.  And, spoiler alert,

7   I'm not sure I entirely agree with that reading of *RJR Nabisco*

8   or the statute as it stands right now.  But I think you're

9   ignoring many other allegations in the complaint about the

10  nexus, or focus, or involvement in U.S. parties and interests.

11  So, for example, there are allegations that the scheme

12  involved sales of broadcasting rights in the United States.

13          So, I guess, going to your victim argument, to the

14  extent that that process got corrupted, that would certainly

15  implicate interests in the United States.  The organizing of

16  soccer matches in the United States, that was also alleged as

17  part of this scheme.  And I'm referring now to the

18  Libertadores scheme number two, which is Count Nine; the

19  holding of some meetings, actually, in the United States; the

20  use of the wire facilities and financial institutions.

21          Now, you say that that's all that was used, but even

22  focusing on that, if co-conspirators are using the banks and

23  the wire system in the United States, it's hard for me to see

24  why that doesn't go to the focus of the wire fraud statute,

25  which is what this is about.  But to the extent that you want

Proceedings                    38

1    to broaden that analysis -- and I don't disagree with you that

2    the law may require me to look a little broader, and there was

3    a case that you relied on, and I think not inappropriately,

4    and I'm going to butcher the name of it, but --

5              MS. PINERA-VAZQUEZ:  Starts with a "P"?

6              THE COURT:  Yes.  Exactly.  *Prevezon Holdings*.

7              MS. PINERA-VAZQUEZ:  There's actually been a couple

8    more, Judge, which I'd like to --

9              THE COURT:  *Prevezon* supports your position that if

10   you have, say, three wire transfers that pass through the

11   United States, that may not be enough.  I guess my point is

12   that's not all that's alleged here, and why aren't all of

13   these other things?  That was just one scheme; there are a

14   couple of other schemes.  Your other argument is that -- but

15   Mr. Napout is not alleged to have done any of these things,

16   namely meet in the United States, or send the wires through

17   the United States, or arrange for soccer matches in the U.S.

18            But that, then, ignores the fact that he's charged

19   as part of a conspiracy; and for the conspiracy, as you know,

20   he just needs to agree that somebody within this conspiracy is

21   going to do some of these things, namely send wires through

22   U.S. financial institutions, or arrange meetings in the U.S.,

23   or engage in conspiracy to achieve a purpose, and somebody

24   then carries out acts that do touch upon the soil, as well as

25   the interest of the United States.

Proceedings                                     39

1          So it strikes me that you're viewing the

2     government's argument so narrowly -- or, rather, the

3     allegations in their complaint so narrowly that you're

4     ignoring what I think are legitimate allegations of not only

5     the use of the wires, which one could argue is the focus of

6     the wire fraud statute, but the greater interest of the United

7     States.  And, by the way, these marketing companies that you

8     mentioned, some of them are based in Miami; right?

9     Trafficking is one of the big ones that implicated in many of

10    these schemes.  Isn't that enough?

11          MS. PINERA-VAZQUEZ:  Judge, if they would have done

12    that, that would be enough.

13          THE COURT:  For a domestic application.  Sorry.  I

14    should have been clear.  For a domestic application of the

15    wire fraud statue.

16          MS. PINERA-VAZQUEZ:  No, Judge, and let me explain

17    to you why.  If they would have done everything that the Court

18    just said, they would have alleged, not proven -- would have

19    alleged that Mr. Napout agreed that other people were going to

20    use the wires in the United States to transfer proceeds of a

21    bribe, there would have been more specific and not just been

22    conclusory allegations that reached conclusions, and then

23    maybe that would have been enough --

24          THE COURT:  Let me stop you for a second.  They

25    allege he participated in a conspiracy to accept bribes with

Proceedings                                  40

1   respect to the marketing and broadcasting rights for various

2   tournaments.  You're saying, though, that more than that, they

3   would say he conspired specifically to use the US wires to do

4   that?

5           MS. PINERA-VAZQUEZ:  I don't necessarily think that

6   it has to be that language, but they have to say more.  They

7   conclude that he entered into an agreement to commit wire

8   fraud.  That's basically all they've done; they haven't listed

9   anything else.  And I don't want to get confused.  There's 15

10  schemes going on in this indictment, 15 schemes of which my

11  client is only charged in two.  While I believe you said

12  Traffic, which it is based in Miami, down the street from my

13  office, to be honest.  It is based in Miami, but my client had

14  nothing to do with Traffic, so that wouldn't apply to him.

15          The important thing to understand here -- and I

16  think *RJR Nabisco* does it well and also a recent case, which

17  was the *Petroreos*, P-e-t-r-o-r-e-o-s --

18          THE COURT:  That is actually the case I was

19  thinking, not *Prevezon*.

20          MS. PINERA-VAZQUEZ:  -- which is a 2nd Circuit case.

21  Basically, your Honor, there could be -- in this case, they

22  actually say exactly what the court says.  They begin with

23  three minimal contacts with the United States; the financing,

24  a witness came here; the invoices were sent to bank for

25  payment, and the bank issued payment.  However, absent any

Proceedings                                    41

1    allegation that the scheme was directed from or to the

2    United States, the activities involved in the alleged scheme

3    falsified took place outside the United States.

4           THE COURT:  But the fact that the schemes did

5    involve arranging from matches in the United States or

6    broadcasting rights to the United States, you don't think that

7    it brings it within even that language?

8           MS. PINERA-VAZQUEZ:  I don't believe that.  My

9    client, with regard to what the Court is saying, is not

10   sufficiently alleged in the indictment.  And as far as the two

11   schemes my client is (sic), which is Copa Libertadores and

12   Copa América, there's no allegation in the indictment

13   regarding what your Honor just said, and I think that's the

14   problem.  There is a presumption that domestic laws do not

15   apply extraterritorially, and that's what -- the

16   Eastern District of New York, 2nd Circuit, all the way up to

17   the Supreme Court, and that's why they instituted this

18   two-step statute.

19          And it's important to understand that there has to

20   be more than simply the use of the banks; otherwise, quite

21   frankly, your Honor, we can basically indict, probably,

22   everybody in the world, because our banking systems is used by

23   the entire world.  So we can probably allege some crime that

24   is not a crime in whatever, in France, and indict anybody.  So

25   I think that's why the court, I think, sought to limit the

NICOLE CANALES, CSR, RPR

Proceedings                     42

1    exercise of jurisdiction with the *RJR Nabisco* case.  And we

2    submit that, our client, all five counts fail, because they

3    hinge and are based on the wire fraud.

4             THE COURT:  Thank you very much.

5             MR. NITZE:  Yes, Judge.  Thank you.  First off, the

6    indictment alleges significant numerous ties to the

7    United States.  Your Honor has touched on some of them, and I

8    won't go through all of them here, but just to give some

9    example, CONCACAF, a confederation known as CONCACAF, is based

10   in Miami.  It was based in New York.  The U.S. Soccer

11   Federation is a member association of CONCACAF.

12            THE COURT:  And CONCACAF is charged if Count 83,

13   with respect to Mr. Napout.

14            MR. NITZE:  Is a part of the enterprise.  The

15   charged enterprise is an element of the association in fact

16   enterprise, as are corporate entities that have bases of

17   operation in the United States, including -- you mentioned

18   TUSA, which is based in the United States.  So there are

19   victims based in the United States.  CONCACAF and the U.S.

20   Soccer Federation would count as victims.  There is activity

21   meetings.  There is physical conduct by charged defendants in

22   the United States.  The indictment alleges that profits from

23   these schemes were derived in part from the growing market for

24   soccer in the United States.

25            The indictment allegations that Mr. Napout and his

1    co-conspirators -- I'm just going to read a section of it.

2    That their reliance on the U.S. financial system was

3    significant and sustained, and was one of the central methods

4    and means in which they promoted and concealed their scheme.

5    All of these allegations are important, and they reflect that

6    this case has real profound affects and ties to the

7    United States.  But it is, I think, important for us to say

8    that doesn't actually matter for your analysis, with respect

9    to the wire fraud counts and the assessment under the test set

10   forth in *RJR*, as to whether these are being applied

11   domestically or extraterritorially.

12          The focus of congressional concern was the use of

13   the U.S. wires, and there is guidance from 2nd Circuit cases

14   and district court cases addressing criminal wire fraud

15   charges that make that point clear; and they often involve

16   allegations where the conduct, or the defendant, or the

17   victims were not located in the United States.  So, for

18   example, to take off three of the 2nd Circuit cases that are

19   often cited in this context, *Kim*, you have a defendant who

20   challenges wire fraud counts because there was no conduct by

21   the defendant or codefendants --

22          THE COURT:  So one question for you -- I mean, these

23   are all pre-*RJR* Supreme Court cases.  Do you think that that

24   would affect -- I mean, the problem is we don't know,

25   necessarily, because there aren't any post-*RJR Nabisco* cases.

Proceedings                                    44

1           MR. NITZE:   *RJR* does not disturb the analysis of

2   whether a wire fraud is -- how you assess whether a wire fraud

3   charge is being applied domestically or extraterritorially.

4   *RJR* assumes without reaching the issue that these are domestic

5   allegations, domestic wire fraud counts, and so RJR's analysis

6   sort of clarifies the test that you apply, and then gets into

7   racketeering, the racketeering statute.  And there had been

8   discussion in the Circuits below and disagreements about

9   whether you should focus on the location of the enterprise, or

10  the affects of the racketeering activity.

11          And *RJR* clarified that you look at -- it has

12  extraterritorial reach to the extent the predicates are

13  alleged -- are properly alleged, extraterritorially.  Another

14  important aspect of *RJR*, which does and should inform how you

15  read some of the cases, especially in the civil RICO context,

16  is *RJR* addresses the private right of action.  And it's clear

17  from some of the cases cited by counsel for Mr. Napout that in

18  the civil RICO context, where the court is grappling with the

19  prospect that private plaintiffs will be enforcing U.S. law

20  without the check of prosecutorial discretion, which is

21  specifically referenced in *RJR,* that there's a distinction to

22  be drawn.

23          They're grappling with how to set up a screen or

24  prevent private litigants from using U.S. courts and the reach

25  of the racketeering statute to get trouble damages, and

Proceedings                                45

1    attorneys' fees, and the remedies that are provided there.  So

2    you have below, before *RJR*, various ways of approaching it,

3    some of which, frankly, ignore the cases on the criminal side

4    of the ledger; the *Gilboe,* and *Kim,* and *Trapilo*, the cases

5    that make clear that what Congress is concerned about in the

6    wire fraud statute is the use of U.S. wires to further

7    fraudulent schemes and enterprises.  And so the Supreme Court

8    in *RJR* says you must allege a domestic injury.  Basically

9    there's a separate extraterritoriality analysis of that 1964,

10   the -- that provision provides private right of action.

11            THE COURT:  *Petroleo*s, the case relied upon by the

12   defense, you would distinguish that in some way, or say that

13   that does not negate the findings of *Kim*, and *Gilboe,* and

14   *Trapilo*.

15            MR. NITZE:  Certainly.  That case is in the civil

16   RICO context.  It's defendants suing -- I think working on --

17   a refinery suing Mexico's national oil company or a subsidiary

18   of it, Pemex, and the court -- the court in *Petroleos* doesn't

19   even engage in an analysis of wire fraud.  It's actually at

20   the level of RICO, without digging into the predicate

21   activity.  And it talks about the thrust of the racketeering

22   activity, whether it's being directed at the United States.

23   It uses language very much akin to the conduct and

24   effects-type language that *Morrison* rejected, and that *RJR*

25   confirms is not the way you look at wire fraud.

Proceedings                                    46

1        THE COURT:  But I agree with you that *RJR,* the

2   Supreme Court decision, didn't necessarily change the analysis

3   that much and largely affirmed what the 2nd Circuit had

4   already held below.  Given that that's true, don't you think

5   the test is a little bit broader than what you're suggesting?

6   It's never going to be enough, even for the prosecution simply

7   to say we had three wires that went through U.S., and that's

8   enough for us to have a domestic application of the wire fraud

9   statute.  You would agree with that?

10       MR. NITZE:  No.  If you look at the cases cited in

11  our brief, the circuit cases, *Kim, Gilboe, Trapilo -- Gilboe*

12  is a nonresident alien.  The criminal acts all occur outside

13  of the United States.  They had no detrimental effect on the

14  United States.  There are some more recent district court

15  cases worth looking at, because unlike the *Petroleos,* and the

16  district court cases in the civil RICO context, these are

17  squarely criminal RICO.  *Hayes,* for example, is a Southern

18  District case that involves manipulation of the yen.

19  Lie bore (phonetic) rate by an overseas defendant, and I'll

20  quote a piece of that ruling, which says:

21          The complaint alleges that the defendant conspired

22  to manipulate the lie bore (phonetic) for yen using

23  United States wires.  Accordingly, there is no

24  extraterritoriality here.  The complaint alleges domestic

25  application because Congress' legislative concern was to

Proceedings                    47

1    prevent the use of United States wires in furtherance of

2    fraudulent enterprises.

3            There's language like that throughout those cases,

4    the district court and circuit cases, which basically indicate

5    that, per *RJR*, which, along with *Morrison*, clarifies that what

6    you're looking at is the conduct relevant to the focus of the

7    statute, and the focus of the statute here is the use of the

8    U.S. financial system, U.S. wires, to promote fraudulent

9    schemes.

10           THE COURT:  No matter how de minimis.  My question

11   really is -- the position you stake out, and it's not

12   necessary for me to agree with that, but I'm curious about

13   what the limits you would say are on the government's

14   authority to prosecute, via domestic application of the wire

15   fraud statute, conduct that may really be focused entirely

16   outside the U.S.

17           Let's say we have a scheme that is completely

18   focused somewhere outside the U.S., and just to use the same

19   language, or terminology, victims are all outside the U.S.,

20   the scheme was hatched outside the U.S., and the only

21   connection is three wires -- let's just use that example --

22   that happen to pass through the U.S. banking system.  It's

23   your contention that that would be enough to apply

24   domestically the wire fraud statute?

25           MR. NITZE:  I would say first that your Honor

NICOLE CANALES, CSR, RPR

1    doesn't have to get anywhere near to --

2              THE COURT:  I agree.

3              MR. NITZE:  -- considering a kind of outer-bounds

4    case, even if we're just focusing on wire activity.  That's an

5    important point to make.  There are lots of allegations in the

6    indictment, and there will be trial proof relating to conduct

7    in the United States, effects in the United States, outside of

8    the use of the financial system and the wires.

9              THE COURT:  Part of your argument is nothing more is

10   necessary.

11             MR. NITZE:  Yes.  So put that aside, because the law

12   is fairly clear, especially after *RJR*, that, conduct and

13   effects, this is precisely what *Morrison* said you're not

14   supposed to do.

15             THE COURT:  And *Kiogal* (phonetic).

16             MR. NITZE:  Yes, in *Kiogal*, it's slightly different,

17   but it's a jurisdictional statute.  But, *Morrison*, you have a

18   mortgage security broker, basically, in Florida with lies in

19   Florida.  There's lots of conduct in Florida, but because the

20   shares that were purchased were on a foreign exchange, the

21   analysis in *Morrison* was the -- Congress' concern in passing

22   10(b) and the rule that flowed from that 10(b)(5) was the use

23   of domestic exchange.

24             And so it doesn't matter that you've hatched the

25   scheme here, that the lies were told here, that the source of

Proceedings                                          49

1   the fraud is here.  What Congress is worried about is the use

2   of the domestic exchange.  So when your Honor asks questions

3   about affects and conduct, *RJR* and *Morrison* make clear that

4   that's not the inquiry.  So my point is if we just focus on

5   wire activity, putting aside that there are, in fact, here, we

6   would meet a conduct and affects test, is the government's

7   position.  Put that aside, just focusing on the wire activity,

8   you're still not anywhere near a universe where you're looking

9   for:  Is our three stray wires enough for us to hang our hat

10  on?  This is alleged and will be proved, systemic reliance on

11  the U.S. financial system.

12          THE COURT:  I don't disagree with you about any of

13  that.  My only question is trying to have you articulate what

14  limits, if any, you think there are on the government's

15  authority.  In other words, three wire transmissions for a

16  scheme that really has no other affect or sort of -- and I

17  apologize for using terminology that, I agree, is no longer

18  the operative framework, but that really have no other

19  connection to the U.S. but that.  You would not argue that, I

20  don't think, just because it's the, trust me, the prosecutors

21  are doing the right thing?

22          MR. NITZE:  The check of prosecutorial discretion is

23  an important one, as you distinguish between civil and

24  criminal RICO, and it's something that the Supreme Court

25  talked about in *RJR*, and it's why that private right of action

NICOLE CANALES, CSR, RPR

Proceedings                                    50

1    caused that difficulty and generated the opinion that it did,

2    and I think is why some of the civil RICO cases are different.

3    But it's not a question of whether you're to trust the

4    prosecutor; Congress has determined that the use of U.S.

5    wires, which -- in furtherance of a fraudulent scheme.  It may

6    be true the whole world relies on the U.S. financial system,

7    but one hopes the whole world is not using the U.S. financial

8    systems to promote fraudulent schemes.

9         What Congress says is if you come here, use -- when

10   I say come here, use at the stability of our markets, the

11   stability of our wire facilities, and our banking institutions

12   to promote fraudulent schemes, you're in violation of federal

13   criminal law.  And the cases that I have mentioned, the

14   circuit cases, *Kim*, *Gilboe*, *Trapilo*, and, I think, *Allen* and

15   *Hayes*, recently, out of the district court, those cases are

16   decided on arguments similar to the ones your Honor is

17   advancing here; that is to say the defendants in those cases

18   say I wasn't in the U.S.; the scheme wasn't hatched in the

19   U.S.; the victim wasn't in the U.S.

20        In *Trapilo*, in addressing that type of argument,

21   the court says these cases teach, as the statute plainly

22   states, what is proscribed is the use of the telecommunication

23   system of the United States.  Nothing more is required.  The

24   identity and location of the victim and the success of the

25   scheme are irrelevant.  Now, I guess I prefer not to advance

Proceedings                                        51

1    our argument way into an area that's very far away from where

2    our case is, but I think those cases stand for the proposition

3    that if you are using the U.S. wires to advance a criminal

4    scheme, you're on the hook.  And I think *RJR's* analysis, the

5    test that it clarifies, and that *Morrison* clarifies, make that

6    clear; that's what you're looking at.  But, here, they're

7    wires galore, reliance on the financial system galore, and so

8    we're not close to -- whatever that line is, even if I were

9    incorrect, that no matter what, the use of the wire puts you

10   on the hook.  We're not close to that line.

11          THE COURT:  Did you want to address at all,

12   Ms. Pinéra's argument about an allegation that the conspiracy

13   actually contemplated using -- I guess you are saying it

14   doesn't matter if the conspiracy is alleged, contemplate use

15   of the wires.  But I think you have alleged that, as a matter

16   of fact, that that was contemplated as part of the conspiracy.

17          MR. NITZE:  Yes.  Not only we wouldn't need to prove

18   actual use of U.S. wires, but we will; and that is alleged

19   over and over in the indictment.  The conspirators are alleged

20   to have used U.S. wires to make these bribe payments, to

21   receive bribe payments, to promote the schemes, generally.

22   The wires needn't be bribe wires to constitute wires

23   sufficient to be wire fraud.  They have to be wires that

24   promote the unlawful scheme.

25          THE COURT:  But does the government need to allege

Proceedings                                                52

1   that the conspiracy was specifically to use the U.S. wires, as

2   opposed to we have a conspiracy that we're going to bribe you,

3   officials of CONMEBOL, or FIFA?  And does it have to say that

4   you're going to use the wires to do that?

5           MR. NITZE:  A substantive wire fraud charge is a

6   charge that you've had a scheme to -- an unlawful fraudulent

7   scheme that makes use of U.S. wires.  The *mens rea* required is

8   that it be foreseeable that the U.S. wires will be used; but,

9   here, not only is it foreseeable, it happens over and over

10  again.

11          THE COURT:  Did you want to say anything,

12  Mr. Tuchmann?

13          MR. TUCHMANN:  No.

14          MR. NITZE:  May I have a moment?

15          THE COURT:  Go ahead.

16              (Pause in proceedings.)

17          MR. NITZE:  Thank you.

18          MS. PINERA-VAZQUEZ:  If I may address four of

19  statements?  First of all, I may have misheard Mr. Nitze, but

20  Congress has not determined wire fraud should be applied

21  extraterritorial.  In fact, there's no specific statement in

22  the wire fraud statute that says --

23          THE COURT:  I think there's no disagreement.  The

24  government's argument is this is a domestic application.

25  You're arguing about the contours of the domestic application

Proceedings                                    53

1   of the wire fraud statute.

2          MS. PINERA-VAZQUEZ:  There's nothing in the wire

3   fraud statute where Congress' intent is reflecting that it

4   should be applied.

5          THE COURT:  We all agree on that.

6          MS. PINERA-VAZQUEZ:  I wanted to make sure.  And why

7   that's important is because the cases that the government is

8   mentioning, which are all pre-*RJR* cases, the *United States*

9   *versus Kim -- they also rely on the Pasquatino* (phonetic)

10  case, and I believe it's called --

11         THE COURT:  *Trapilo*.

12         MS. PINERA-VAZQUEZ:  -- *Trapilo*.  All those are

13  pre-*RJR*.  And contrary to what the government says, it is

14  actually quite significant.  And the *Kim* case, for example, in

15  the *Kim* case, the 2nd Circuit, in 2001 -- actually decided

16  before *Morrison*, which was a 2010 case -- they specifically

17  ruled that a reference to foreign commerce does not indicate

18  congressional intent.  So according to him, Congress

19  amended -- that was the argument, that they had amended the

20  wire fraud statute to add foreign commerce, to reach fraud

21  schemes in furtherance of foreign wires.

22         And the test that they used before *Morrison* was that

23  such a reference does not mean that the wire fraud statute is

24  applicable extraterritorially.  But what it does address is

25  the test by *RJR*, which is the shift in focus to the looking at

1    the predicates act.  No longer look at cause and effects.

2    Look at the predicate acts.  That was a shifted focus.

3              THE COURT:  You're talking about the wire fraud

4    statute?

5              MS. PINERA-VAZQUEZ:  The wire fraud statute, Judge.

6    The other thing I want to point out, because the government

7    made a big deal about the fact that *RJR* was a civil RICO, but

8    I think the Court will agree with me that there is significant

9    case law in this circuit and in others that because it is a

10   hybrid statute, that includes both a criminal cause of action

11   and a civil cause of action, that the Supreme Court has always

12   said that those interpretations and the development of the

13   case law go hand and hand.  In other words, one part of the

14   RICO statute is not interpreted a certain way because it is

15   civil and another one because it's criminal.

16             And I'd like to point out to the case of *Sedima*

17   (phonetic) *versus Imrex*, I-m-r-e-x, 473 U.S. 479, 1985 case,

18   where the Supreme Court specifically held that they routinely

19   reject proposed civil-criminal decisions in the construction

20   of hybrid statute with criminal and civil applications such as

21   RICO.  So because *RJR* was a civil case, does that mean that it

22   should be interpreted any different in its criminal

23   application?  And I believe Judge Alito actually did say that,

24   that even though it's a -- it was a civil case.  It was RJR

25   Nabisco versus the European Union.  You still apply the same

1    law to the criminal part of it.

2          What the government is referring to, which I believe

3    it is 1962 F, which is where the attorneys' fees and all that

4    other civil stuff comes in, that has nothing to do with

5    criminal application.  It's separate and apart.  It's in a

6    separate section in the opinion, towards the end.  But when

7    the court is interpreting this test, the two-step test that

8    has to be taken, in analyzing whether domestic law should be

9    applied to extraterritorial, it is the same thing, civil or

10   RICO.  So all those cases that have interpreted *RJR,* whether

11   they're civil or criminal, are applied exactly the same.

12   There is no distinction.

13         THE COURT:  Correct me if I'm wrong; I think part of

14   *RJR* was a finding that because it was a civil case there had

15   to be a greater showing of an interest in the U.S. or some

16   contact.  And I'm looking at the government in part because I

17   think it was in *RJR,* and that's where this distinction was

18   made about in the criminal context you wouldn't necessarily

19   have to have that, but in the civil context more had to be

20   shown, for the private right of action.  And I'm looking at

21   page 2106 of the Supreme Court's decision, 136 Supreme Court

22   2090.  And that's ultimately why the decision gets sent back

23   to the 2nd Circuit.

24         "The creation of a private right of action raises

25   issues beyond the mere consideration of whether underlying

1   primary conduct should be allowed or not, entailing, for

2   example, a decision to permit enforcement without the check

3   proposed by prosecutorial discretion," which is, I think, what

4   Mr. Nitze was referring to.  So there is expressly recognized

5   in *RJR* distinction between RICO cases brought by the

6   government that in theory have the prosecutorial check on them

7   and civil cases, such that there's an additional requirement

8   in a private right of action to show that a person was injured

9   in his business or property by reason of the Section 1962

10  violation.  And, admittedly, it goes to the damage provision.

11          MS. PINERA-VAZQUEZ:  What's important is the entire

12  previous section, when it's interpreting what the test should

13  be in applying these laws to form condone (phonetic), that

14  does not change whether it's a civil or criminal case.

15          THE COURT:  Let me cite you to another part of the

16  same decision, 2108.  It says nothing in Section 1964(c)

17  provides a clear indication that Congress intended to create a

18  private right of action for injuries suffered outside the

19  United States.  So, there, it seems to again reenforce the

20  notion that the private right of action, which, of course, is

21  a congressional act, with respect to its creation, is

22  different than the criminal application.

23          So I think it contradicts the more general principle

24  you're saying about interpreting statutes that have both a

25  criminal and civil application exactly the same, where

Proceedings                                      57

1    at least there seems to be some congressional intent that they

2    be applied differently and, perhaps, have stricter

3    requirements as to extraterritorial application for a civil

4    action.  That's what I read *RJR* as saying.

5              MS. PINERA-VAZQUEZ:  I believe that's the section

6    that's talking about the damages, when it comes to private

7    damages.

8              THE COURT:  Yes, but, again, I think it goes to this

9    notion that somehow Congress didn't necessarily want to treat

10   the civil application of RICO the same as the criminal

11   application.  Maybe you're right in terms of the --

12             MS. PINERA-VAZQUEZ:  -- the interpretation of the

13   underlying statutes of the test.  It's the same test whether

14   or not it's a civil case or a criminal case.

15             THE COURT:  Go ahead, Mr. Nitze.  What did you want

16   to say?

17             MR. NITZE:  *RJR* doesn't say anything, and it's

18   entirely consistent with -- doesn't say anything about

19   entirely consistent with the cases that proceeded it out of

20   this Circuit and the district courts here in the criminal RICO

21   context that discuss when a wire fraud charge is domestic wire

22   fraud charge.  The *RJR* case talks about -- assumes for the

23   purpose of its opinion that there were domestic wire fraud

24   allegations.  Before it gets to the private cause of action,

25   it is sorting through how do you conduct this

NICOLE CANALES, CSR, RPR

Proceedings                                    58

1    extraterritoriality analysis in the context of RICO.

2         RICO is an unusual statute because you have an

3    enterprise; you have the pattern of activity, and discussion.

4    Where do you focus?  Is it where the enterprise is?  Is it

5    where the affects are?  And it clarified its extension is

6    extraterritorial to the extent the predicates alleged in

7    support of it apply extraterritorially.  It didn't get into

8    when you're looking at a wire fraud charge it is a domestic or

9    an extraterritorial application.  I want to be clear we are

10   alleging domestic violations of the wire fraud statute.  And

11   those cases from the Circuit, in *Hayes* and *Allen*, are all

12   still good law.

13        THE COURT:  Right.  Your view is that *RJR* left all

14   those cases alone, with respect to that issue.

15        MR. NITZE:  Yes.  My point in raising the passage

16   your Honor read, which was what I was referring to that

17   references prosecutorial discretion, my point in focusing on

18   the private cause of action is only that to the extent there

19   is tension in the district court cases that have been cited by

20   the parties here, that tension -- there's a line running

21   through those cases.  Some are on the civil side.  And it

22   stands to reason that the courts on the civil side dealing

23   with what in those cases are civil plaintiffs seeking damages

24   from civil defendants, they're grappling with the very concern

25   that Justice Alito talks about here, in concluding need to

Proceedings                                    59

1    show domestic injury, which is are we going to allow just

2    three wires here?  Is this enough?

3              And to the extent there is a tension, it is likely

4    informed by that, by trying to figure out how to cabin the

5    civil litigation.  The Supreme Court has now clarified how you

6    do that.  Instead of wondering about how many wires, they will

7    say have you alleged a domestic injury, and they will follow

8    the course laid out by the Supreme Court.  But it's telling

9    that those cases often ignore or fail to discuss the cases on

10   the criminal side that deal with wire fraud.  There are some

11   that do.  There's one district court case that says -- I think

12   it's *Kim* where the circuit says we're not going to have a

13   couple of civil RICO cases that make us throw out the holdings

14   of these criminal cases.

15             THE COURT:  Agreed.  But you have to admit that if I

16   adopt wholesale you're position, literally one wire through

17   the United States, or in the United States, would be enough to

18   apply domestically the wire fraud statute to conduct -- and,

19   again, I'm going to use old language -- that really had no

20   context at all with the U.S., where the scheme and everything

21   else that happened with respect to the scheme occurred by

22   foreign individuals outside the U.S., that's the logical end

23   of the argument that you're making.

24             MR. NITZE:  We're urging you to follow --

25             THE COURT:  I'm not saying you're doing that.

Proceedings                               60

1          MR. NITZE:  The law on that point is clear.  You

2    don't have to get there in terms of -- that's not this case.

3    The one you're describing is not this case.

4          THE COURT:  I understand your argument.

5          MS. PINERA-VAZQUEZ:  One last thing, because

6    Mr. Nitze just said that they're arguing a domestic

7    application.  *RJR* is pretty clear that it said there are two

8    ways to apply extraterritorial laws to extraterritorial

9    jurisdiction, and -- it's in the statute, and Congress said

10   so, or you have to go through this whole focus analysis.  It's

11   not just, oh, we're just applying it domestically.  It has to

12   go within *RJR Nabisco* second-step policy, and they have to

13   show that the focus of the statute was --

14         THE COURT:  No disagreement there; that's exactly

15   what the government says they are arguing and doing.

16         MR. NITZE:  We focused our arguments on wire fraud,

17   I think, rightly so.  I just want to make clear the

18   racketeering conspiracy allegation is not limited to wire

19   fraud predicates.  There are money laundering predicates that

20   do have extraterritorial reach; there are obstruction of

21   justice predicates that do have extraterritorial reach, but it

22   makes sense that we focus on wiretap.

23         THE COURT:  Understood.  Anything else from the

24   defense?

25         MS. PINERA-VAZQUEZ:  Nothing else, your Honor.

61

1          THE COURT:  Thank you, everyone.  I'm going to issue

2    an opinion shortly and take this under advisement, but you'll

3    hear from me very soon.  Thank you, everyone.

4                   (Proceedings adjourned.)

5

6                          *  *  *

7

8          I certify that the foregoing is a true and correct
     transcription of the record from proceedings in the
9    above-entitled case.

10       /s/ Nicole Canales          February 16, 2017
            Nicole Canales                  Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25